Henry C. **HUBBARD**, Plaintiff,

v.

**UNITED STATES** of America and Silvio O. Conte, Defendants.

**Civ. A. No. 4316.**

United States District Court
E. D. Virginia,
Alexandria Division.

Jan. 21, 1969.

Carl Budwesky, Alexandria, Va., for plaintiff.

Stefan C. Long, Asst. U. S. Atty., Alexandria, Va., for the United States.

Fred C. Alexander, Jr., Alexandria, Va., for defendant Conte.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The plaintiff, Henry C. Hubbard, was shot while deer hunting on a United States military reservation. This suit for damages against the United States and one Silvio Conte followed.

In count one of his complaint Mr. Hubbard alleges that the commanding officer of the military reservation where the deer hunt was conducted, and his subordinate officers, were negligent in authorizing Congressman Conte and two other men, who did not attend the scheduled briefing the night before, to participate in the hunt and in failing to point out to the Congressman the spot where the plaintiff was standing on his right, and by placing him and the Congressman within range of their guns; and that said negligence was the direct and proximate cause of his injuries.

In count two Mr. Hubbard alleges that Congressman Conte, together with two others, were briefed by Army personnel on the routine and rules of the hunt, namely, that the hunters would stand at assigned positions and that the deer would be driven towards them; that he was advised where fellow hunters were to stand and was cautioned to learn and know the position of the hunter on his right and left; and that all of the hunters were cautioned to fire only to the front or back and not in the direction of their fellow hunters; that he (Hubbard) was stationed on the Congressman's right flank some fifty or so yards to the south; that when two deer ran between them Congressman Conte fired his shotgun in the direction where he was standing, in a negligent manner, resulting in his being hit in the forehead, and that the Congressman's negligence in so doing was the proximate cause of his injuries.

Mr. Hubbard prayed for damages against the United States and Congressman Conte, or either of them.

The United States in its answer denied all acts of negligence laid to its military officers and alleged that had Congressman Conte followed the instructions given him the accident would not have occurred. The Government further pled assumption of risk and contributory negligence on the part of the plaintiff, and claimed that Mr. Hubbard's suit against it is barred by the indemnity agreement he signed prior to engaging in the hunt. It cross-claimed against the plaintiff for any damages assessed against it in this proceeding.

Congressman Conte in his answer admitted the negligence sought to be laid to the United States in count one of the complaint and denied all acts of negligence laid to him in count two thereof. He also pled assumption of risk and contributory negligence on the part of the plaintiff and alleges that the indemnity agreement signed by the plaintiff prior

to engaging in the hunt ran to him as a member of the Congress of the United States, and that if the said release be not so construed then the plaintiff's suit against him is barred on the ground that Mr. Hubbard has released a party who is or may be a joint tort-feasor responsible for the injuries complained of.

Congressman Conte cross-claimed against the United States for damages assessed against him in favor of the plaintiff and demanded a jury trial on all issues.

Both claims, counts one and two, were heard together, the one against Congressman Conte by the jury and the one against the United States by the Court. The jury returned a verdict in favor of the defendant Conte. Judgment was entered thereon.

The plaintiff timely moved the Court to set aside the verdict and to vacate the judgment rendered thereon and to grant him a new trial on the ground the Court should not have given an instruction on assumption of risk and on contributory negligence, and upon the ground the Court improperly instructed the jury in telling them that in order to find in favor of the plaintiff they must find that Conte's negligence was solely the cause of the plaintiff's injury.

Upon reviewing the transcript of the evidence and the charge to the jury, the Court is of the opinion that the plaintiff's motion for a new trial ought to be denied. An order to that end will be entered herein.

█ Much of the evidence as to what happened on the day of the hunt was in dispute. The jury could have found the shooting accidental, caused by Conte's negligence, or the result of negligence on the part of Conte and Hubbard. The jury resolved the question in favor of Congressman Conte. There is ample evidence in the record to support that finding.

In the charge the jury was told that they would only determine the plaintiff's claim against the defendant Conte and that they would not have the benefit of the Court's decision in the plaintiff's claim against the United States because the liability, if any, on the part of the Government is not in one iota dependent upon the liability or non-liability on the part of Mr. Conte. Conversely, the liability of Mr. Conte has no bearing whatsoever—if there be any liability on his part, Conte's liability has no bearing whatsoever on Mr. Hubbard's claim against the Government.

Pertinent portions of the charge read:
" * * * [T]his was a deer hunt. You should take that into consideration. * * [O]ne who voluntarily goes on a deer hunt, and this applies to * * * both the plaintiff * * * and the defendant, assumes the risk of injuries incident thereto and cannot recover for any injury received from such an activity, absent proof of negligence on the part of the person causing the injury complained of. In other words, reduced to simplicity, it gets back to the question of negligence."

Negligence was defined as follows:
" * * * [N]egligence is a word that you are all familiar with. It is, really, not hard if you stop to think, to consider it, and to apply it. Negligence is the failure of a person to use for the safety of another the care required of him by law after he knows, or by the exercise of reasonable diligence, could know of the danger to such other person, and after he has had a reasonable opportunity to exercise such care. Negligence is the doing or not doing of some act which a reasonably prudent person would not do under the same or identical circumstances and conditions here existing. In other words, it is the failure to use ordinary care under the circumstances existing.
"Ordinary care, in law, is that care which reasonably prudent persons—and here, the persons we are referring to are reasonably prudent deer hunters—exercise in the management of their own affairs in order to avoid injury to themselves or their property or the persons or property of others.
" * * * [O]rdinary care is not an absolute term, but a relative one. That is

to say, in deciding whether ordinary care was exercised in a given case, the conduct in question must be viewed in the light of all the surrounding circumstances, as shown by the evidence in the case, * * * because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required in the use of ordinary care will vary with the nature of what is being done [under] all the surrounding circumstances [as] shown by the evidence in the case. * * * [P]ut [in] another way, as the danger that should be reasonably foreseen increases, so the amount of care required by law also increases."

The jury was further told:

" * * * [T]he mere fact that an accident has happened, or that someone has been shot, standing alone, does not permit the jury to draw the inference that the accident was caused by anyone's negligence.

" * * * [Y]ou are to * * * evaluate the evidence here in determining whether or not Mr. Conte [or] Mr. Hubbard * * * they are both charged with [the duty of] using ordinary care under the circumstances, and it is your duty to examine [the] evidence carefully and [determine] * * * whether or not Mr. Conte exercised * * * [the] care that an ordinary prudent hunter, hunting in the place and under the circumstances he was confronted with, would have then and there exercised.

"If you find that he did exercise such care, then, of course, he is not guilty of negligence. If you find that he failed to exercise that degree of care which I have explained to you, then he is guilty of negligence, and if you find from the evidence that he is guilty of negligence, you must next determine whether his negligence was solely the cause of the injuries complained of.

" * * * [S]o that you will understand what I mean, 'solely,' that means whether or not, as far as this case is concerned, his [Conte's] negligence—you are not called upon to determine whether or not it concurred with or did not concur with any negligence the government may or may not have been guilty of—this is an action only between Mr. Hubbard and this defendant and insofar as he is concerned and in response to a suit for judgment by Mr. Hubbard, his negligence —and you must so find—must solely have been responsible for Mr. Hubbard's injuries.

" * * * [E]ven though you find that he was negligent under the circumstances in this case, if you also find by a preponderance of the evidence that the plaintiff, himself, was guilty of any negligence under the circumstances, and negligence [as] to him * * * is the want of ordinary care that either caused or concurred or effectively contributed to his injury, then he cannot recover, because that is called contributory negligence, * * * the law in Virginia does not allow one, even though he is injured by someone else's negligence, to effectively contribute [in causing his] injury by his own negligence.

" * * * [T]he burden is upon the defendant in this case [to satisfy] you by a preponderance of the evidence, that the plaintiff was negligent. That is an affirmative defense. The plaintiff does not have to prove that he was not negligent or his negligence did not in any degree effectively contribute to cause or concur in causing his injury. Insofar as his negligence is concerned, that burden is upon the defendant, and if [he does] not satisfy you that his negligence—if you find any negligence on his part— effectively contributed to cause or concurred in causing his injury, then that defense fails."

When read as a whole, the word "solely" as used in the charge refers to Congressman Conte's negligence when equated with the plaintiff Hubbard's (contributory) negligence. The jury was clearly told they were not to consider the negligence, if any, on the part of the United States in their determination of whether or not there was negligence on the part of Congressman Conte. When so equated, Congressman Conte's negligence must

be the sole cause of the plaintiff's injuries for him to recover.

Mr. Hubbard's counsel argued to the jury that Congressman Conte was trying to lay the blame on the Government. That is why the Court so charged the jury. The Court perceives no reversible error in the use of the word "solely" as here used.

The plaintiff complains only of the giving of an instruction on assumption of risk and on contributory negligence, not on the instructions as given. There was ample evidence in this case to require the giving of such instructions and the verdict of the jury will not be disturbed on that account.

The evidence and exhibits presented to the Court and the jury disclose that the deer hunt in question was held at the Camp A. P. Hill Military Reservation located in Caroline County, Virginia, on November 30, 1964. Mr. Hubbard was invited to participate in the hunt by Major J. A. Christensen, an Army legislative liaison officer, through a Mr. Nease. Congressman Conte received his invitation from Major Christensen via Congressman Quie.

Major Christensen sent all of the guests, including the plaintiff and the Congressman, a four- or five-page letter on the stationery of the Secretary of the Army pertaining to the proposed hunt. This letter, among other things, listed the following safety rules:

"All hunting safety rules apply. *A RED OR YELLOW CAP AND ARTICLES OF OUTER UPPER CLOTHING IS REQUIRED.* Only empty guns, taken down or with action open, may be brought into or carried in Camp A. P. Hill except when bearer is actually hunting. Hunters will insure that they have a safe field of fire to and beyond their targets. Individuals shooting near any road or trail will take extra precautions to assure that the angle and direction of fire are such as not to endanger troops, passing motorists or pedestrians. * * * "

The letter further advised the guests that they would be briefed the evening prior to the first day of the hunt. Mr. Hubbard attended this briefing; Mr. Conte did not. He and two other gentlemen arrived at A. P. Hill early on the morning of the hunt. They were then briefed by a Lieutenant Martin, an Army officer who had conducted the briefing the previous night.

Lieutenant Martin drew a rough diagram of the hunt site, in the form of a horseshoe, showing the hunters approximately where they would be standing and the area through which the deer would be driven. He made a rough sketch of the fire plan for the hunting area. The hunters were allowed to fire until they received a word-of-mouth command to cease fire. Each hunter, on seeing the drivers, was to pass the command to cease fire to the hunter just ahead of him. The Lieutenant further testified that he instructed his subordinates to tell each hunter when placing him on the stand where the hunter on each side of him was located—they were told to point them out.

Both Mr. Hubbard and Congressman Conte were drivers during the morning hunt. Both were placed on stands after lunch. Two military vehicles drove the hunters to the hunt site. Sergeant Traynor placed Congressman Conte some seventy-five meters from the intersection of the two trails near where the jeeps were parked. He said he was instructed by his superior officers re his duties in connection with the hunt. He was told how to place the hunters and to tell them how and when they could shoot. Each hunter was told to learn where the hunter on his right and left were located and was given a field of fire. Sergeant Traynor remembered the Hubbard accident but had no independent recollection of Congressman Conte or what he told him on the day in question, except that he remembered where he had placed the Congressman.

Corporal Sleeman placed Mr. Hubbard on Congressman Conte's right some fifty yards down the trail, south of the intersection of the trail on which Congress-

530

man Conte was stationed. He pointed the Congressman out to Mr. Hubbard. He then placed another hunter some thirty or forty yards below where he had placed Mr. Hubbard, and then went further down the trail into the woods awaiting the drive to begin. Shortly thereafter he saw two deer come by and heard two or three shots. He later shot at another deer that was then behind the drivers. He then went by to pick up Mr. Hubbard and noticed blood on his face. Mr. Hubbard then told him that the butt of his gun must have hit him in the face as he was shooting at the deer.

Congressman Conte was an experienced hunter. He admitted that he was familiar with the rules of deer hunting and that he had hunted deer in several states. He said that he and two other gentlemen had been briefed by Lieutenant Martin some thirty minutes before the drive began. He had no recollection, however, of Lieutenant Martin showing him a sketch of the hunt ground. He was a driver on the morning hunt and was placed on the stand after lunch by Sergeant Traynor and was told where the deer were coming from and not to expose himself. He knew where the hunter on his left was located but did not know that there were any hunters on his right. He heard dogs and a shot and then saw two deer running in front of him. When he saw the large deer on his right at about a forty-five-degree angle, he shot and missed. The deer then ran towards him and he took two more shots. The deer then ran between him and the hunter on his left. The hunter on his left took a shot when the deer was behind him. The Corporal then came up and told him the hunt was over. He said that Mr. Hubbard was hurt. The Congressman said that he did not learn where Mr. Hubbard was stationed until the next day when he went back to the hunt site.

Mr. Hubbard was likewise an experienced hunter. He had been on previous deer hunts at Camp A. P. Hill. He admitted that Lieutenant Martin sketched the hunt area during the night briefing and that he told the hunters what to do and what not to do; that he told them to fire in front of them and to stop firing when the drivers said to cease fire. He said he walked some twelve paces from the trail and sat beside a tree waiting for the drive to begin. He said the terrain was so rough and the brush so thick he could see better by sitting down. He admits that Corporal Sleeman placed him but denied that the Corporal pointed out where Congressman Conte was stationed. When he heard the deer coming he got up and raised his gun in a position to shoot. He could not then see more than thirty yards. He remembers hearing a shot and thought that he had fired and that his gun had hit him in the face. It was later learned that Mr. Hubbard's gun had not been fired.

Both Mr. Hubbard and the Congressman claimed that they could not see each other due to the terrain and the heavy growth and that it was snowing quite heavily and was quite dark when the drive began.

Mr. Hubbard was given first aid and was then taken to the Fredericksburg Hospital. He was then transferred to the Alexandria Hospital. X-ray films disclosed that a large bullet and bullet fragments had penetrated his right frontal lobe and that several fragments were lodged in the right parietal lobe. He was then taken to the operating room and a right frontal osteoplastic craniotomy was performed. The bullet fragments were removed, with the exception of the parietal fragment—it was left within the skull. Mr. Hubbard remained in the hospital for approximately one month. He required private nurses at home for several weeks thereafter.

Mr. Hubbard claims that he has frequent headaches and gets dizzy quite often and that he has suffered an impairment of memory since the accident. His wife says he was quite interested in his business prior to the accident and that he has lost all interest since the accident. Mr. Hubbard's treating physicians cor-

roborated a substantial portion of his complaints.

The neurologists who examined Mr. Hubbard for the Government testified that Mr. Hubbard received a gunshot wound in the right frontal temporal region, and that he has no specific neurologic residual of injury by neurological examination at this time (date of trial).

Mr. Hubbard spent some $3,000.00 in hospital and medical expenses. He was sixty-nine at the time of the shooting. He and his wife, as sole owners of a corporation, were then engaged in the real estate and construction business.

Invitees to the hunt were required to execute an indemnity agreement prior to participation in the hunt. The release, signed by both Mr. Hubbard and Congressman Conte, reads as follows:

"I have read and understand Post Regulations regarding hunting and fishing and I agree to obey Federal and State of Virginia laws and all Post Regulations.

"GENERAL RELEASE

"For and in consideration of allowing me the privilege of being permitted upon the premises and property of the United States of America, specifically on the Military Reservation indicated above, for the purpose of hunting, fishing, boating, water skiing, or other sport activities, I do hereby agree to hold and save the Government, its officers, agents, servants, and employees in their capacities as such, and as individuals, harmless from liability of any kind or nature and I do hereby remise, release and forever discharge the UNITED STATES OF AMERICA, its officers, agents, servants, and employees from any and all manner of claims, actions, suits, debts, judgments or demands of any kind whatsoever, based upon injury of any nature to my person or my property as a result of or as an incident to hunting, fishing, boating, water skiing, or other sport activities on said military reservation, as well as any activities connected therewith, including any travel or transportation which may arise, or thereafter can, shall, or may have.

"I certify under the penalties for perjury, that I am at least 21 years of age, or that the reverse side of the form is signed by my parent or guardian.

"I HAVE READ AND UNDERSTAND THE ABOVE.

"Witness   Date   Signature of Applicant

―――――――――――――――――――――――― "

◆

Upon these findings the Court concludes that the United States is not liable for the injuries sustained by Mr. Hubbard while deer hunting on its A. P. Hill Military Reservation.

■ Mr. Hubbard was an invited guest [1] of the United States Army. He was invited to participate in the deer hunt in question by one of its legislative liaison officers. Under these circumstances the Army owed him the duty of exercising reasonable care in selecting the place for, and in conducting, the hunt.

■ The burden is on the plaintiff to prove that the Army was negligent in performing one of these duties. He failed to so do.

The plaintiff offered no evidence designed to show the hunting site or the pre-hunt preparations and briefings were inadequate. To the contrary, the

1. See Smith v. Allen, 297 F.2d 235 (4th Cir. 1961) for an interesting discussion of the legal relation between host and guest—this is not a hunting case. No Virginia case has been cited specifically determining the relationship between host and invited hunter.

record here made discloses that all of the hunters, including the plaintiff, were fully advised of how and where the hunt was to be conducted—a lay-out in the shape of a horseshoe was drawn on the board for all to see. They were told how, when and where to shoot and where the hunters on their right and left were to be placed.

Mr. Hubbard and Congressman Conte were drivers on the morning hunt. They then became, or should have become, familiar with the terrain, and saw, or should have seen, how and where the hunt was conducted and where the hunters on the stands were spotted.

■■ The plaintiff's claim that Congressman Conte was permitted to participate in the hunt without being briefed is not supported by the evidence. The fact that his briefing was conducted in the morning (before the hunt) and not the night before is immaterial.

■ The plaintiff's claim that the Army personnel failed to advise Congressman Conte where they had placed him on the stand and that they had been placed within the range of each other's gun is likewise not supported by the evidence. The soldier who placed Mr. Hubbard pointed out where Congressman Conte had been placed. The soldier who placed the Congressman had no independent recollection of what he had told the Congressman—he said that he had been instructed to point out and to tell the hunters when he placed them to learn the exact location of the hunters on their right and left. This soldier had been performing hunt duty for several years. Both Mr. Hubbard and Congressman Conte said they did not know where the other was stationed until after the accident. Both were experienced deer hunters and both were told in their respective briefings to learn where the hunters on their right and left were stationed before shooting.

■ Even were the Army negligent in the premises (and the Court does not so find), the plaintiff's negligence under Virginia law would bar recovery.

Mr. Hubbard admitted that the terrain was rough and overgrown with a thick growth of underbrush, that it was snowing and nearly dark, and that he could not see more than thirty yards when he got up from under the tree upon seeing the deer running towards him. He knew, or should have known, where the other hunters were stationed before thus exposing himself. He was briefed to so learn before going on the hunt.

■ Mr. Hubbard assumed the attendant risk when he voluntarily joined the hunt.[2] He knew or should have known that hunting deer with a shotgun at relatively close range in a wooded area heavily overgrown with trees and underbrush is a hazardous avocation at best. The release he signed, among other things, should have so warned him.

■ Everybody has the duty of exercising ordinary care at all times for his own safety—that includes hunters. The care required depends on the circumstances and conditions then existing. Mr. Hubbard failed to exercise such care.[3]

In view of the findings and conclusions here made, it is not necessary that the Court determine whether § 8–654.2 of the Code of Virginia is applicable to this case or whether the general release signed by the plaintiff prior to engaging in the hunt bars his recovery.

2. See Buffalo Shook Company v. Barksdale, 206 Va. 45, 141 S.E.2d 738 (1965), for the difference between assumption of risk and contributory negligence. The essence of contributory negligence is carelessness, but of assumption of risk, venturousness—the voluntary assumption of a known hazard. Assumption of risk rests on two premises: (1) that the nature and extent of the risk are fully appreciated; and (2) that it is voluntarily incurred.

3. Negligence, contributory negligence and proximate cause are generally questions for the trier of the facts. See Bates v. Thompson, 200 Va. 501, 106 S.E.2d 728 (1959), and cases cited therein.

The plaintiff's claim against the United States should be dismissed, and an order so decreeing will be entered herein.

Congressman Conte's and the United States' cross-claims will be dismissed for lack of proof.

Counsel for the defendants should prepare an order in accordance with this memorandum opinion, submit it to counsel for the plaintiff for approval as to form, and then to the Court for entry.